176 So.2d 45

**Jo Ann PLEMMONS**

**v.**

**STATE.**

**7 Div. 772.**

Court of Appeals of Alabama.

March 23, 1965.

Rehearing Denied April 13, 1965.

Beck & Beck, Fort Payne, for appellant.

Richmond M. Flowers, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

JOHNSON, Judge.

The appellant, Jo Ann Plemmons, was indicted by the Grand Jury of DeKalb County for the offense of murder in the second degree. The jury returned a verdict of guilty as charged in the indictment. A motion for a new trial was subsequently overruled and, hence, this appeal.

The appellant allegedly killed her husband by stabbing him with a knife at approximately 11:00 P.M. on February 15, 1963. There were no eyewitnesses to the stabbing.

The tendencies of the evidence presented by the State were as follows:

Mr. Roy Burk and his wife lived in an apartment in the same building in which the appellant and her husband had an apartment. At about 6:00 P.M. on the day of the stabbing Mr. Burk heard the appellant's husband cursing the appellant "about her going out with somebody, going out with another man." At approximately 11:00 P.M., Mr. Burk walked into his apartment and heard the appellant's husband cursing in the Plemmon's apartment, and after a few seconds Burk heard a "commotion" that sounded like a couch was bumping against the wall. He heard the appellant's husband say, "You won't do that," and then he heard a screen door slam. Burk walked out of his front door and saw the appellant and her husband standing outside their apartment. Burk testified in part: "She was standing a good piece from him looking back. He was standing leaned over." Burk went back into his apartment and the appellant came to his door and hollered that she thought she had killed her husband. Burk then called the police.

Cecil Reed, a policeman employed by the City of Fort Payne, arrived by car at the apartment house shortly after Burk's call. Reed testified that the appellant walked to his car when he drove up, that he followed her to a point across the road from the apartment house where the appellant's husband was lying on the ground, that the appellant "fell down" over her husband, and that upon being asked what was wrong the appellant replied, "I cut him. I cut him in self-defense." The appellant made no further statements at that time concerning what had happened.

State Toxicologist William T. McVay attributed the death of the appellant's husband to "internal hemorrhage into the left pleural cavity and suffocation on blood in the air passage, which appeared to be caused by a cut or stab wound which was thrust inward into the body."

The State's evidence tended to show that the appellant and her husband were both intoxicated at the time of the altercation.

Before testifying in her own behalf, the appellant called four witnesses and offered to show by each of them that there had been prior difficulties between the appellant and her husband in which the husband was the aggressor. It was shown that the husband had beat the appellant on several prior occasions and that he had threatened to kill her. Many objections by the State to testimony sought to be elicited from these witnesses were sustained on the theory, apparently, that the offered testimony constituted details of prior difficulties, and at one point the court did not allow a witness to establish who the aggressor was in a prior difficulty.

Upon taking the stand as a witness in her own behalf, the appellant testified concerning prior difficulties with her husband before attempting to establish her claim that the homicide was justified by reason of self-defense. She testified that her husband had beat her on several prior occasions when he was drunk, that he burned her back with a cigarette on one occasion, that he had threatened to kill her on a prior occasion, that he was turbulent and violent when drunk, and that she had to leave him after some of their difficulties. After giving this testimony the appellant testified that on the day of the fatal encounter she and her husband ate lunch at a cafe and did some shopping during the afternoon, that while they were waiting for a taxi her husband asked her to go with him to get some whiskey, that she wanted to go to her mother's house instead but he got mad and would not let her go to her mother's, and that upon his insistence she went with him to a place where he bought a pint of vodka, after which they returned to their apartment. Then the following testimony was given during direct examination of appellant:

"Q. When you got back home what happened then? Do you recall?

"A. He set the bottle on the table and asked me to have a drink with him. I told him I didn't want any, and so he didn't insist. We sat around and talked a while and later in the afternoon he asked me again to have a drink, and I told him I didn't want it. I was afraid of him when he was drunk. I didn't want a drink.

"Q. What did he say, if anything?

"A. He said, 'But I want you to drink with me.' I didn't take a drink. He said, 'I want you to drink. You do as I say.' I knew well enough not to cross him like that, so I drank with him.

"Q. Did you make another trip after that to the grocery store?

"A. I went to the curb market and bought a chicken for supper, and he had to go get another pint of vodka. When we got back home my husband cut up the chicken for supper, and he kept drinking and getting higher. I cooked the chicken and set it on the table.

"Q. Did you have any other drink with him?

"A. Yes, sir. I had three or four.

"Q. Then he said he would cut up the chicken, and then what happened. I cooked the chicken and we started eating and then I mentioned to him about going to my mother's. That made him mad and he cursed me and my mother and the whole family. He threw me in the floor, and every time I would get up he would throw me back down in the floor, and then he knocked the back of my head against the floor and the wall, and was telling me over and over that he was going to kill me. He said, 'I am going to kill you, Jo. I am going to kill you.' He look-

ed wild. I was scared to death, and he was laughing like a maniac.

"Q. Did you get anything during that?

"A. I grabbed a knife and kept him off by cutting at him. I kept telling him to get back.

"Q. What were you doing while you were cutting at him?

"A. I was keeping him off with the knife. I was begging him to get back.

"Q. Did he come on to you?

"A. Yes, sir.

"Q. Did you go to the door?

"A. Yes, sir.

"Q. What happened to you then?

"A. He grabbed me, and I hit him pretty hard that time. Then I got out the door.

"Q. Did you get loose from him?

"A. He slung me out the door and started kicking me. I cut at him again. I kept cutting at him. As I was getting out the door he grabbed me and I cut at him real hard.

"Q. After that what happened?

"A. I kept running, and when I got out in the yard I turned around and looked, and he was coming toward me holding his chest. I saw he was cut pretty bad, and I went back to him."

No evidence of prior difficulties was offered subsequent to this testimony.

■ Appellant contends that the court below erred in refusing to allow the appellant to go into more detail concerning prior difficulties between the appellant and her husband which was offered to show the general nature and gravity of the difficulties.

In Fancher v. State, 217 Ala. 700, 117 So. 423, we find:

"In homicide cases, where the evidence presents an issue of self-defense, the defendant as well as the state may prove the fact of a prior difficulty. It goes to the inquiry as to who was the aggressor. * * *

"Until some evidence of self-defense is produced the court is not in error in refusing such evidence at the instance of the defendant. * * *"

In Sanders v. State, 242 Ala. 532, 7 So. 2d 483, it was held that evidence offered by a defendant in a homicide case to show a prior difficulty between the defendant and the deceased must be subsequent to evidence tending to show self-defense. Foster, J., wrote in Sanders:

"Before such matter is admissible, there must be a tendency of other aspects of the evidence to show that defendant was without fault in bringing on the fatal rencounter: that he was in imminent peril, real or apparent, of loss of life or limb, that he could not avoid the difficulty or retreat without increasing his peril. And if an act was committed by him in the nature of a present provocation, he was not without fault. Unless there is a tendency of the evidence favorable to defendant on those questions, he cannot prove the bad character of deceased for turbulence, nor threats by him toward defendant, nor a prior difficulty with him, though of a serious nature. * * *"

And in Byrd v. State, 257 Ala. 100, 57 So.2d 388, it was stated:

"* * * In Sanders v. State, 242 Ala. 532, 7 So.2d 483, it was pointed out that there is a difference with reference to proof of prior difficulties where the state seeks to introduce such evidence and a situation where the defendant seeks to introduce such evidence. When such evidence is offered by the state showing the conduct of the defendant on the former occasion, it is to illustrate his acts at the time of the fatal difficulty but when it is offered by the defendant it must be subsequent to evidence tending to show self-defense. Such evidence when offered by the defendant is not admissible if he was the aggressor in the difficulty which then and there resulted in the killing. * * *"

In the instant case evidence of prior difficulties between the appellant and the deceased was offered by the appellant at a time in the trial proceedings when there was no evidence tending to show that appellant was in imminent peril, that she was not the aggressor in the fatal encounter, and that she was without fault in bringing on the fatal encounter. The evidence was insufficient to present a jury question on self-defense until the appellant testified in her own behalf. All evidence concerning prior difficulties between appellant and the deceased offered by appellant prior to that time should properly have been excluded.

Though it does not appear that the trial court excluded evidence concerning prior difficulties on the specific grounds that such evidence was offered by appellant prior to evidence tending to show self-defense, we are of the opinion that the court cannot be held in error for excluding such evidence when it was, in fact, offered prior to evidence tending to show self-defense.

Having examined the entire record and found no error, this cause is due to be and the same is hereby

Affirmed.

PRICE, P. J., not sitting.