328 So.2d 612
**Carolyn F. MAULDIN, alias**

**v.**

**STATE.**

**8 Div. 590.**

Court of Criminal Appeals of Alabama.

Dec. 9, 1975.

Rehearing Denied Jan. 20, 1976.

Robert Straub, Decatur, and C. E. Carmichael, Jr., Tuscumbia, for appellant.

William J. Baxley, Atty. Gen., and Jane LeCroy Robbins, Asst. Atty. Gen., for the State.

TYSON, Judge.

The appellant was indicted for the first degree murder of Leland Scott Curenton "by shooting him with a pistol." At trial the jury found the appellant guilty of murder in the second degree and fixed punishment at twelve years, six months, imprisonment. The trial court then pronounced judgment, setting sentence in accordance with this verdict.

Dr. Vann Pruitt, State Toxicologist, testified that he performed an autopsy on the body of Scott Curenton and determined that the cause of death was a gunshot wound in his chest, which pierced and caused severe damage to the heart.

Criminologist Brent Wheeler testified that he conducted ballistic tests and determined that the bullet which caused Curenton's death was fired from a pistol recovered from the appellant's home.

Edna Mauldin testified that her son, Philip Mauldin, and the appellant had been married for about nine years, but that they had been having marital difficulties prior to Monday, October 1, 1973, the date of the shooting.

Highway Patrolman Elvis Cochran testified that he was the first officer to reach the residence of Philip Mauldin on Ponderosa Drive in Colbert County on the afternoon of October 1, 1973. He said that upon his arrival he observed a young woman, whom he identified as the appellant, in the yard near the rear of the house, kneeling down beside a man on the ground. Cochran stated that appellant was upset and asked him to check the man, that he did so, and determined he was dead. Cochran added that he found a shotgun in the yard near the decedent's body.

Marie Montgomery testified that she lived on Ponderosa Drive across the street

from Philip Mauldin. She stated that around 5:00 p. m., October 1, 1973, while looking out of a front window of her house, she noticed Bill Mauldin, Philip's father, drive into his son's driveway. Appellant and Philip refused to let him in the house, and he walked back toward his car. Mrs. Montgomery said that as Bill Mauldin neared his car, she saw the appellant come running out of the front door with a pistol in her hand and fire a shot in the direction of Bill Mauldin as she screamed, "Mr. Mauldin, you s. o. b., I swear I'll kill you. [R. 88] Mr. Mauldin had walked behind his car by this time and the shot struck the side of the car. Mrs. Montgomery stated that she then saw appellant turn and fire a shot in the direction of Scott Curenton, who had come out of a side door of the house. She said that she did not actually see this second shot fired because appellant's back was to her, but immediately after it was fired she heard Scott Curenton say, "Oh, my God," several times as he slumped down behind a car over in Philip Mauldin's driveway.

On cross-examination, Mrs. Montgomery testified that she never saw Scott Curenton with a shotgun, but that a parked car in the driveway across the street partially blocked her view, and that she could only see him from his chest up.

James Long, an investigator for the Colbert County Sheriff's Office testified that he arrived at the scene around 5:30 p. m. He stated that he recognized the body as being that of Scott Curenton, whom he knew. He said that he recovered the shotgun that was lying in the yard, that it was loaded, but the safety was on.

At this point the State rested.

Bill Mauldin's account of the events which took place at his son's house on Ponderosa Drive in Tuscumbia in the late afternoon and evening of October 1, 1973, was essentially the same as that of the State's key witness, Marie Montgomery. However, a significant addition was his testimony that Scott Curenton had a shot-gun to his shoulder while the shooting was going on. He added that at the time of the shooting, his son and the appellant were in the process of getting a divorce, and that the matter had been pending for about four months.

Philip Mauldin, appellant's husband, testified that he and his wife had been having marital difficulties prior to the fatal shooting during which time she had been seeing the deceased, Scott Curenton. He stated that on the Saturday before the shooting, he received a phone call from the appellant, who was in Florence, Alabama, at the apartment of Scott Curenton. He said that he drove to Florence, picked her up, and carried her back to their house in Tuscumbia. He added that the appellant had numerous bruises and scratches about her face, and a bursted mouth. Mauldin testified that on the afternoon of October 1, 1973, he and appellant were at home in Tuscumbia, that they were joined by Curenton, and that the three of them sat in the dining room and discussed a beating that Curenton had recently administered to the appellant. He stated that the appellant went outside to speak with Bill Mauldin, who had knocked at the front door, and shortly thereafter a shot was heard, at which time Curenton went into the utility room, grabbed one of his, Mauldin's, shot-guns off a gun rack, and ran outside. Mauldin said that he followed Curenton outside and said, "Scottie, drop the gun," and Curenton replied, "Well, I'll kill you." About this time, appellant came around the side of the house and told Curenton to drop the gun, and he said, "I'll kill you too." Mauldin said that Curenton had the shotgun pointed at the appellant and was trying to find the safety when the appellant fired. He testified that the appellant and the deceased had had fights on previous occasions, that she weighed about 105 pounds.

Hawley McCorkle, an uncle of the appellant, testified that one day in August of 1973, when the appellant was a patient in

Colbert County Hospital, he had to physically remove Scott Curenton from appellant's room after he refused to leave peacefully.

Another of the appellant's uncles, Ford McCorkle, said that he was present at Philip Mauldin's house after the shooting when the sheriff searched the car of the deceased and found a box of pistol cartridges and some empty beer cans.

Shirley Johnson, appellant's aunt, testified that she was present at Philip Mauldin's house on the evening of October 1, 1973, after the shooting, at which time the appellant was hysterical. Mrs. Johnson said that the appellant's lip was bursted and badly swollen, that she had a black eye, and a big bruise on the side of her head.

In rebuttal, the State recalled Edna Mauldin to the stand. She said that around October 3, 1973, her son, Philip, came by the house, at which time they discussed the shooting. She said Philip told her that he had the shotgun and put it down when Carolyn, the appellant, went out the door and "Scott must have got it."

Appellant's request for the affirmative charge was refused, and her motion for a new trial was overruled.

### I

Appellant asserts that the trial court erred in refusing to allow testimony as to two instances of prior difficulties between the appellant and the deceased.

■ In the first instance, appellant was not allowed to question Marie Montgomery as to a prior difficulty. At this point in the trial, no testimony as to self-defense had been presented, thus, the trial court's ruling was correct. *Sanders v. State,* 242 Ala. 532, 7 So.2d 483; *Plemmons v. State,* 42 Ala.App. 638, 176 So.2d 45, cert. denied, 278 Ala. 711, 176 So.2d 48.

The other instance complained of relates to a question directed to appellant's husband, Philip Mauldin, wherein he was asked:

"Q. Do you know of any other prior difficulty involving violence that Carolyn had had with Scottie other than this occasion before the shooting incident occurred? Of your own personal knowledge, do you know that they had or not had any other incidents of violence involving him and her such as fights— things of that kind?

"A. They had had fights.

"Q. On other occasions?

"A. Yes sir.

"Q. So you are saying that before the day of the shooting that Carolyn and Scottie had had previous incidents of difficulty.

"MR. PATTON: Now, I'm going to object to it, if it please the Court, unless the proper predicate is laid to show what time he is talking about, when these occurred. To say they had fights some time prior to that, I believe, is too indefinite." [R. 248–249]

■ This second question is too broad and general, and therefore indefinite as it is not limited as to time or place. Further, such evidence would not shed light on the guilt or innocence of the accused. *Lovell v. State,* 51 Ala.App. 286, 284 So.2d 741.

### II

Appellant excepted to the oral charge of the trial court, asserting that it failed to instruct the jury that one is under no duty to retreat when within one's own home. Appellant cites us to *Davis v. State,* 48 Ala.App. 58, 261 So.2d 783, cert. denied, 288 Ala. 741, 261 So.2d 785, wherein the trial court's instruction indicated that a man is "usually" not required to retreat from one's own home.

In the case at bar, at the conclusion of its oral charge, the trial court gave three

of appellant's written requested charges, among them being given Charge No. 12:

"CHARGE NUMBER 12: Where one is attacked in her own home or in the house yard which constitutes the curtilage of the home, she is never required to retreat; for it is her castle, and the law permits her to protect its sanctity from every unlawful invasion."

Further, just before reading the requested charges, the trial court indicated [R. 340]:

". . . These charges are not to be taken as changing or contradicting the Court's oral charge, but they are to be taken together with the Court's oral charge and together with the Court's oral charge constitute the law applicable to the facts in the case and applicable to your decision of the facts in the case."

■ In light of these instructions, we feel that error is not shown. Title 7, Section 273, Code of Alabama 1940.

### III

On cross-examination Philip Mauldin, appellant's husband, was asked as to the whereabouts of his wife on the night of March 21–22, 1973. The District Attorney brought up a sworn statement by the witness in a divorce petition which purportedly contradicted the witness' explanation of his wife's whereabouts.

At this point in the proceedings, the trial judge intervened and advised the witness, Philip Mauldin, of his constitutional rights as to self-incrimination, and also as to the penalties for perjury. The witness then declined to answer the question.

Since the question was unanswered, clearly there could be no impeachment on an immaterial matter.

Appellant's counsel also asserts that the trial judge's advice as to the penalties for perjury was tantamount to imputing perjury as to this witness, and therefore reflects on the credibility of appellant's key witness, her husband.

■ Since Mr. Mauldin declined to answer the question, and moreover stated that he was claiming his immunity upon advice of the trial court, such unanswered question in our opinion does not carry the connotation as suggested by counsel.

### IV

On rebuttal, the State recalled Mrs. Edna Mauldin, who testified that several days after the shooting, she had a conversation with her son, Philip Mauldin, at which time he told her "he had the shotgun and put it down when Carolyn went out the door and Scott must have got it." [R. 311, 313]

Appellant contends that this was new evidence, and that the trial court therefore erred in refusing to allow her to recall her husband, Philip Mauldin, in surrebuttal.

On direct examination Philip Mauldin had testified that he saw Scott Curenton get the shotgun from the gun rack in the utility room near the carport and run outside. Then, from his cross-examination by the District Attorney, we find [R. 263–264]:

". . . Now, I ask you when you ran out to see what Carolyn was doing, did Scottie Curenton pick up the shotgun that you had put down and went out the sliding glass door?

"A. I didn't put no shotgun down there."

■ Thus, it is clear that Mrs. Mauldin's rebuttal testimony did not constitute new evidence, but was merely a continuation of that elicited by the State on cross-examination. The trial court properly exercised its discretion in allowing this rebuttal testimony. *Borland v. Mayo,* 8 Ala.

104; *Ellison v. State,* 33 Ala.App. 405, 34 So.2d 185.

We have carefully examined this record and find no error therein. The judgment is therefore due to be and the same is hereby

AFFIRMED.

All the Judges concur.